**Richard W. SCHOMAKER, an adult individual, Appellant**

**v.**

**ZONING HEARING BOARD OF the BOROUGH OF FRANKLIN PARK, Borough of Franklin Park and Voicestream Pittsburgh, L.P. d/b/a T–Mobile.**

Commonwealth Court of Pennsylvania.

Argued April 20, 2010.

Decided May 21, 2010.

Deborah S. Miskovich, Pittsburgh, for appellant.

Alice B. Mitinger, Pittsburgh, for appellee, Voicestream Pittsburgh, L.P., d/b/a T-Mobile.

BEFORE: LEADBETTER, President Judge, BROBSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge BROBSON.

Richard Schomaker (Objector) appeals from an order of the Court of Common Pleas of Allegheny County (trial court) that affirmed a decision of the Zoning Hearing Board (ZHB) of the Borough of Franklin Park (Borough). The ZHB granted two dimensional variances to T-Mobile for the placement of a communications tower on a tract of land in an M-1 (Mixed Use Residential/ Commercial) District (hereafter M-1 District) in the Borough. We reverse the trial court's order.

By application dated January 18, 2008, T-Mobile requested a variance from the ZHB, seeking permission to deviate from the setback requirements of section 212-29.Y.5 of the Borough's zoning ordinance (Ordinance) in order to erect a 150' monopole communication tower. T-Mobile has a lease with the owner (Pennsylvania Power/First Energy, hereafter Owner) of a 2.7-acre tract of land (the Property) located in an M-1 District in the Borough. Owner uses the Property as an electrical substation and for associated transmission equipment and poles.

The Borough's Ordinance permits communications towers in M-1 Districts as a conditional use. Section 212-29.Y.5 of the Ordinance requires that "[a]ll communications towers shall be set back from any residential property line or public street right-of-way a minimum of 200 feet." Before seeking approval for the tower as a conditional use, T-Mobile sought to obtain the dimensional variances at issue.[1] The ZHB conducted three hearings, and based upon the evidence the parties offered, rendered a decision granting the variances. We summarize the ZHB's pertinent factual findings below.

T-Mobile's Federal Communications Commission (FCC) License requires it to provide communications services throughout western Pennsylvania, including the Borough. In order to provide such coverage, T-Mobile selected the Property based upon the topographical characteristics of the area and in order to improve coverage for the area around the Borough and the nearby intersection of Routes 79 and 279, where coverage is presently limited.

The proposed tower would: (1) be placed on a 40' × 40' portion of the Property; (2) conform to the Institute of Electrical Electronic Engineers Revision G standards; and (3) have 24 panel antennas on top of the monopole, which would be situated on an 8' × 16' concrete pad that would also have four cabinets for transmitting and receiving equipment. An advantage of the 150' pole (as compared to one that is 200') is that it does not need to be lighted. Also, the design of the pole will afford safety to nearby properties because if it were to topple, it would collapse upon itself.

---

1. Initially, T-Mobile sought three dimensional variances, but ultimately requested only two.

Both commercial and residential uses are present on the properties in the vicinity of the Property, and all are within the M–1 District. Objector's property, his residence, is located adjacent to and north of the Property.[2] The Property is the only location in the Borough that would enable T–Mobile to accomplish its purpose to provide greater coverage. T–Mobile's other attempt to enhance coverage by the placement of equipment on nearby structures was insufficient to close the coverage gap.

T–Mobile cannot erect the pole in conformity with the setback requirements as to all residential and interstate right-of-way property lines, because of the shape, size, topography, and existing conditions (including the existing substation and its equipment) of/on the Property.

As to Objector's property, the ZHB, without making a definitive determination, found that T–Mobile estimated the distance between the proposed placement of the pole and Objector's home to be 458′ and that Objector estimated the distance to be only 319′. There is a significant upward slope between the proposed location of the tower and Objector's home. The tower would face the rear of Objector's home. If T–Mobile were to place the pole further from Objector's property line to increase the setback, the change in elevation would require T–Mobile to increase the height of the pole, which would increase visibility of the pole. With regard to the highway right-of-way boundary line, that property is separated from the proposed location by a significant, non-buildable, downward slope.

Based upon these factual findings, the ZHB first noted that T–Mobile will be required to satisfy the other requirements necessary for its conditional use approval and that the question of whether the placement of the pole on the Property would be lawful under Section 212–12 of the Ordinance was not at issue.[3] The ZHB concluded that the factors relating to the Property noted above precluded the placement of the poles in a manner that would not violate the setback requirements.

The ZHB then considered the facts and T–Mobile's request in light of our Supreme Court's decision in *Hertzberg v. Zoning Board of Adjustment of the City of Pittsburgh*, 554 Pa. 249, 721 A.2d 43 (1998), and concluded that T–Mobile had satisfied its burden under *Hertzberg* to a demonstrate hardship that supported the ZHB's granting of the requested relief. The ZHB also held that there was insufficient evidence to support Objector's claim that the placement of the tower near his home would result in devaluation of his property, and it also held that the requested relief were the minimal variances necessary to afford relief. Ultimately, the ZHB granted variances as follows: (1) variance of approximately 137′ to permit placement 62′ away from the northern neighbor's (Objector's) property line; and (2) variance of approximately 145′ to permit placement 54′ away from the eastern boundary line (DOT's right-of-way for I–79 and 279).[4]

2. T–Mobile engaged in negotiations with Objector for the lease of his property for the tower, but they could not reach an agreement. According to T–Mobile's characterization, Objector was asking an exorbitant amount.

3. This section of the Ordinance prohibits more than one main building, structure, or use unless the Ordinance authorizes additional uses. Objector raised the question of whether the substation constituted the sole "main" use of the lot, but the ZHB recognized that issue as one the governing body should consider when T–Mobile requests a conditional use permit.

4. T–Mobile's initial proposal also would have required a variance as to the setback from the adjacent easterly neighbors, the Etters, but T–Mobile altered its initial application such that

Objector appealed to the trial court, raising issues we summarize as follows: (1) that the ZHB exceeded its jurisdiction in addressing T–Mobile's variance request before the governing body considered whether T–Mobile is entitled to a conditional use permit; (2) that the existing substation constitutes an existing "illegal, non-conforming use," and that the ZHB's action improperly expands the alleged non-conformity; (3) that the ZHB's decision is not supported by substantial evidence because evidence in the record indicates that the Property is suitable for permitted uses and T–Mobile's evidence also shows that the variances are for the convenience of T–Mobile and Owner rather than to alleviate a hardship peculiar to the Property; and (4) that T–Mobile failed to satisfy its burden to establish a hardship justifying the grant of the variances.

The trial court affirmed the ZHB. First, the trial court concluded that Objector's argument regarding the alleged non-conforming use is without merit, because the substation is an approved conditional use within the M–1 District. Further, the trial court reasoned that the topography of the Property supported the ZHB's conclusion that the proposed location for the tower is the only feasible place to locate the tower on the Property. Finally, the trial court opined that, once T–Mobile obtains the variance, the proposed use would be consistent with the conditional use provisions of the Ordinance and hence not pose a detriment to the public welfare.

■ In this appeal, Objector raises the following issues: (1) whether the trial court erred in its analysis and application of the legal standard for the grant of a dimensional variance; (2) whether the trial court erred in concluding that T–Mobile's proposed placement of a communication

no variance is needed with regard to the

tower on property that has a utility substation as a principal use is permitted in the M–1 District in which the Property is located; and (3) whether the following factual findings of the ZHB are supported by substantial evidence: (a) that the topographical characteristics of the Property only permit placement of the tower in a location on the Property that will make the placement non-compliant as to the Ordinance's setback requirements; and (b) that the proposed placement of the tower is a location that faces the rear of Objector's home.

The five factors an applicant generally must demonstrate to establish entitlement to a use or dimensional variance are set forth in Section 910.2 of The Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended,* added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10910.2, and may be summarized as follows:

a. unique physical conditions peculiar to the property have created an unnecessary hardship;

b. those peculiar conditions make it impossible to develop the property in strict compliance with the ordinance and a variance is necessary to enable the reasonable use of the property;

c. the applicant did not create the unnecessary hardship;

d. the grant of the variance will not be detrimental to the public welfare; and

e. the variance sought is the minimal variance that will afford relief and the least deviation from the ordinance provision at issue.

Our Supreme Court in *Hertzberg,* while generally applying the above five criteria applicable to use variances to dimensional variances, opined that, in certain circum-

eastern property line.

stances, courts may employ a relaxed application of the five factors when an applicant seeks a dimensional variance. In *Hertzberg,* our Supreme Court reasoned that dimensional variances differed significantly from use variances, because applicants seeking dimensional relief within an area where a use is permitted are "asking only for a *reasonable adjustment* of the zoning regulations in order to utilize the property in a manner consistent with the applicable regulations." *Id.* at 257, 721 A.2d at 47 (emphasis added).

The Supreme Court observed that the facts in *Hertzberg* presented an appropriate forum to address the distinction between use and dimensional variance requests and the appropriate analysis courts should apply based upon that distinction. The Court first discussed a pre-*Hertzberg* decision, *O'Neill v. Zoning Board of Adjustment,* 434 Pa. 331, 254 A.2d 12 (1969), that hinted at the need for courts to reflect upon the distinction. *O'Neill* involved an applicant who sought

> to construct a twenty-six story apartment building consisting of 225,809 square feet of floor space and an open area of only 5%. The property was located in a C–3 commercial district which permitted the construction of apartment buildings but limited the allowable floor space to 84,646 square feet and required an open area of 20%.
>
> .    .    .    .    .
>
> *O'Neill* was not the appropriate case to apply a less strict standard for the grant of a dimensional variance because the 'apartment building would be more than a mere technical and superficial deviation from the space requirements. The building would contain approximately two and one half times as much floor space as is now permitted under the zoning ordinance. In such a situation, petitioner's remedy would appear to be

a rezoning and not a variance.' *O'Neill,* 434 Pa. at 338, 254 A.2d at 16.

*Hertzberg,* 554 Pa. at 258, 721 A.2d at 47. The *Hertzberg* Court distinguished *O'Neill,* noting that the applicant before the Court was seeking "to make do with the size of the building as is, which is smaller than the zoning requirements. Thus, the case . . . is one in which 'a mere technical and superficial deviation from space requirement' is sought." *Id.*

Ultimately, our Supreme Court stated that "[t]o justify the grant of a dimensional variance, courts *may* consider multiple factors, including the economic detriment to the applicant if the variance was denied, the financial hardship created by any work necessary to bring the building into strict compliance with the zoning requirements and the characteristics of the surrounding neighborhood." *Id.* at 264, 721 A.2d at 50. Our Supreme Court deemed these factors pertinent in *Hertzberg,* but the Court did not broadly state that all of these factors are relevant in analyzing every dimensional variance request.

In fact, some more recent decisions of this Court have pointed out that the zoning hearing boards and courts should not view *Hertzberg* as having eliminated the rule that "a substantial burden must attend all dimensionally compliant uses of the property, not just the particular use the owner chooses." *Yeager v. Zoning Hearing Bd. of the City of Allentown,* 779 A.2d 595, 598 (Pa.Cmwlth.2001). In that case, an applicant wanted to operate a Land Rover auto facility. The owner admitted that it could satisfy the setback requirements if it decreased the display space at the front of the building or if it reduced the size of the building, but that Land Rover would not approve such designs. The Court concluded that the applicant was not entitled to the variances, because the hardship was not created by the topographical conditions

but rather based on the applicant's "personal desire to sell vehicles for Land Rover." *Id.* The Court noted that the property was suited to the general purpose for which it was zoned and *used*—a car dealership, and that the ordinance did not burden that use. Rather, the applicant had proven only that the ordinance burdened his personal desire to sell vehicles for Land Rover.

The Court in *Yeager* also referred to our decision in *Society Created to Reduce Urban Blight v. Zoning Board of Adjustment*, 771 A.2d 874, 878 (Pa.Cmwlth.) (*SCRUB*), *allocatur den.*, 567 Pa. 733, 786 A.2d 992 (2001). In that case, this Court considered an application for a variance by an outdoor advertiser (applicant) who wanted to erect a sign on property the City of Philadelphia had licensed to the Philadelphia Authority for Industrial Development (PAID), and which the City's Water Department used as the site for its Southeast Water Pollution Control Plant. PAID entered into an agreement with the applicant to sub-license a portion of the property for the sign. The City's Licensing and Inspections agency denied a request for a permit because of various aspects of the proposal that did not comply with the City's zoning ordinance. In challenging the denial, the applicant contended that a hardship existed because of the existing uses on the property, and the remaining land (sub-licensed to applicant) could be used only for parking spaces or an outdoor sign. The City's Board of Adjustment concluded that the applicant had established an undue hardship and granted the variance, but the trial court reversed, noting that the property had value as zoned, and that, although the present use for the Water Authority did not require

the use of the entire parcel, the property had a use. The trial court also concluded that the hardship was self-created based upon the license agreement.

The applicant relied upon *Hertzberg* in its appeal to this Court. In discussing the applicant's reliance on *Hertzberg,* we stated that

> while [that case] eased the requirements for granting a variance for dimensional requirements, it did not make dimensional requirements ... "free-fire zones" for which variances could be granted when the party seeking the variance merely articulated a reason that it would be financially "hurt" if it could not do what it wanted to do with the property, even if the property was already being occupied by another use. If that were the case, dimensional requirements would be meaningless—at best, rules of thumb—and the planning efforts that local governments go through in setting them to have light, area (side yards) and density (area) buffers would be a waste of time. Moreover, adjoining property owners could never depend on the implicit mutual covenants that placing dimensional restrictions on all property would only be varied when there were compelling reasons that not to do so would create a severe hardship.

*SCRUB,* 771 A.2d at 877–78.

In *SCRUB,* this Court concluded that the applicant had not demonstrated undue hardship even under *Hertzberg.* The Court regarded the dimensional restrictions as being more in the nature of use restrictions (creating an area prohibiting signs within 500 feet of another sign).[5] We explained that "[e]ven if we consider

---

5. "A dimensional restriction deals with restrictions caused by the size of the lot, not, as here, by conditions of the lot. What the 550 feet spacing requirement does, in effect, is

create a 'floating zone' that only permits signs on property when there is not another non-accessory advertising sign within 500 feet." *SCRUB,* 771 A.2d at 878.

those requests dimensional variances, just because a person wants to do more with his or her land in addition to the use that it is presently being used for is not a sufficient unnecessary hardship unique to that piece of land." *Id.* Further, we noted that:

> [A]n unnecessary hardship [is not] created because [the other use on the property] requires a large amount of unoccupied, grassy area in order to isolate it from the surrounding area. Again, nothing guarantees a property owner that every square foot of his property can be occupied. Just because [the applicant] entered into a sublease arrangement with PAID does not prove that the property could not be used for any other purpose but only that PAID wanted to utilize every inch of its leased property and the hardship was self-created.

*Id.* at 878.

Objector also refers to the Court's decision in *Township of East Caln v. Zoning Hearing Board of East Caln Township*, 915 A.2d 1249 (Pa.Cmwlth.2007). That case involved an application by Cingular, relating to property it leased in the township. The property was the site of a self-storage facility, and previously a communications company had obtained a conditional use permit to construct a tower. Cingular wanted to replace the existing tower with a taller one and to locate associated equipment near the tower. Cingular proposed to place both the existing antennas and additional Cingular antennas on the new tower. As in this case, the applicant sought to eliminate a coverage gap. In order to install the replacement tower, Cingular was required to obtain a dimensional variance. As in this case, the ZHB made factual findings relating to other aspects of the applicant's position that did not relate to the features of the property, and rested its conclusion that a hardship existed on the fact that the coverage gap presented a life-safety issue resulting in a severe hardship to Cingular.

The Township challenged the decision, arguing that there were no unique physical conditions of the property and that a variance was not necessary to enable the reasonable use of the property. On appeal, the trial court agreed with the ZHB's reasoning, noting that economic detriment was not the sole basis for the ZHB's decision and that a variance was needed to better serve the people. Also, the trial court concluded that the natural topography of the land necessitated a taller tower so that calls, especially 911 calls, are not dropped.

This Court recited the language from *Yeager*, commenting that applicants for dimensional variances continue to carry the burden to demonstrate more than simply that the regulation imposes a burden on the applicant's desired use of the property. The Court reversed the trial court, reasoning that the safety issue was insufficient and that the property at issue could continue to be used to house the existing tower and the self-storage business. Further, we opined that Cingular's evidence showing that no other site in the area would satisfy its coverage needs was not a factor for the Court to consider in determining whether a hardship exists.

T–Mobile argues that *Yeager* and *East Caln* are not squarely applicable to this case, suggesting that T–Mobile is unlike the applicants in those cases, because it is not seeking to avoid the setback requirements solely for its own financial benefit. Rather, T–Mobile argues that other non-financial facts exist in this case, including the size, shape and topography of the Property. We disagree with T–Mobile's argument seeking to distinguish *East Caln*. In *East Caln*, the Court based its decision in pertinent part on the fact that

someone was already making reasonable use of the subject property, and based on that fact, the Court concluded that the applicant had failed to demonstrate a burden associated with the *property*.

Further, our Supreme Court's hesitancy in *O'Neill* to apply a less restrictive standard where the applicant was seeking "more than a *technical* and *superficial*" departure from the zoning ordinance, suggests the question of whether this case involves a similar deviation and whether the present request contemplates more than a "reasonable adjustment" to the Ordinance, as the Supreme Court characterized the dimensional variance in *Hertzberg*. Our Supreme Court in *Hertzberg* did not describe where courts should draw the line between these two concepts. We note, however, that both the dimensional variances T–Mobile seeks represent a departure from the Ordinance requirements of approximately seventy-five percent. While we note that T–Mobile is not seeking de minimis variance relief (which involves a standard lower even than *Hertzberg*), we must assume that the distinction the Supreme Court made between "technical" deviations from and "reasonable adjustments" to a zoning ordinance has some meaning. The refusal of zoning hearing boards and courts to reflect this distinction in their decisions could result in the evisceration of a governing body's legislative prerogative.

Based upon our foregoing conclusions that T–Mobile has not established a hardship that entitles it to the variances it requested because the Owner is already making reasonable use of the Property, we agree with Objector that T–Mobile did not carry its burden of proof with regard to the alleged hardship associated with the Ordinance setback requirements. Also, we believe that the deviations from the Ordinance that T–Mobile requested constitute more than a "reasonable adjustment" of the Ordinance.

Although we do not need to address Objector's remaining issues, we will discuss them briefly below.

■ Objector argues that testimony in the record, quoted below, indicates that T–Mobile could place its tower on the Property in conformity with the Ordinance:

> Mr. Perego: —one of the requirements for this kind of variance is that this be the minimum variance required to effectively use the property. Couldn't you move that pole on the existing lot and get it closer to the existing tower and away from the back line?
>
> McCombs: We could, except we are coming down an elevation, and the actual tower height would have to be increased.
>
> Mr. Perego: So what you lose in distance you gain in height, so it's—are you telling me that it's six and one half, a dozen of another?
>
> McComb: Yes, basically. I mean, if we came down to the level area by the substation, we would probably have to raise the height of the tower to about 190 foot.
>
> Ms. Mitinger: Is that a standard size facility in feet, going from 150 to 190?
>
> McComb: I'm sorry?
>
> Ms Mitinger: Is that a standard size monopole?
>
> McComb: Yes, it is still within the standards, yes.

(Reproduced Record 60a–61a.)

Although this testimony indicates that T–Mobile could construct a tower in a position that is less dimensionally noncompliant, this testimony does not support Objector's claim that the tower could be placed on the Property in such a manner

**1204**

that T–Mobile would not need variances.[6] We acknowledge, however, that this testimony does not indicate that the ZHB, as affirmed by the trial court, granted variances that are the *least* that will afford relief. Hence, in our view, T–Mobile has not satisfied the fifth prong described in Section 910.2 of the MPC, that the variances requested are the minimal variances necessary to afford relief to T–Mobile.

■ Objector contends that T–Mobile created any hardship that exists with regard to the Property, because there is other property, specifically his own, upon which T–Mobile could construct the tower in compliance with the setback requirements. The availability of other property is not a factor that is relevant here, as the question of whether a hardship exists is one that is specific to the particular property at issue. We do, however, agree, that in accordance with *SCRUB* and *East Caln*, T–Mobile did create its own hardship when it entered into the lease with Owner before seeking variance relief.[7]

Objector also contends that substantial evidence does not support two of the ZHB's factual findings. First, Objector challenges the ZHB's finding that T–Mobile cannot place the tower on the Property in a dimensionally compliant position.

For the reasons stated above, we agree with T–Mobile that this issue is without merit. Objector also asserts that substantial evidence does not support the ZHB's finding that the rear of Objector's property will face the tower. Objector asserts that the area of his house that appears to be in the rear, because it does not have street frontage, is actually the front. Objector, however, does not indicate how such an error would affect the ZHB's legal conclusions under the variance standards. At most, based upon Objector's argument, such an error appears to be nothing more than harmless error.

Accordingly, we reverse the trial court's order affirming the ZHB's grant of dimensional variances to T–Mobile.

### *ORDER*

AND NOW, this 21st day of May, 2010, the order of the trial court is REVERSED.

■

---

**6.** An illustrative drawing indicates that the greatest width of the property is about 300 feet. Hence, this evidence makes clear that T–Mobile could not construct the proposed tower in accordance with the 200 foot setback requirements.

**7.** With regard to the fourth prong of the variance analysis, Objector asserts that the tower will change the essential character of the neighborhood. But given the evidence in the record concerning the present use of the property, and the fact that the Ordinance itself permits towers as a conditional use, we find no merit to Objector's argument.